FILED

MARLENE BALA, In Pro Se
4308 Toland Way
Los Angeles, CA 90041
Tel: 323-327-2293

2012 MAR 13  PM 12: 13

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____



# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLENE BALA, individuals, on behalf of themselves and all others similarly situated.<br><br>Plaintiffs,<br><br>v.<br><br>COUNTRYWIDE BANK, FS, as the Original Lender; RECONTRUST COMPANY N.A., as the Original Trustee; LANDSAFE TITLE, Title Company; BANK OF AMERICA, N.A., as the Servicer; BEAR STEARNS & CO., INC., FTN FINANCIAL CAPITAL, BLAYLOCK & PARTNERS, LP, DEUTSCHE BANK SECURITIES, and VINING-SPARKS IBG, LP, as a Joint Book Running Managers; FEDERAL NATIONAL MORTGAGE ASSOCIATION, as PSA Issuer and Administrator; CAPITAL RESEARCH AND MANAGEMENT COMPANY, and THE GROWTH FUND OF AMERICA, INC, as PSA Filer; RECONTRUST COMPANY, N.A., as the Foreclosing Trustee; T SEVILLANO, as Assistant Secretary of Assignment of Deed of Trust, NINOUSH SAMIMI the Notary of the Assignment of Deed of Trust; and DOES 1 THROUGH 10, INCLUSIVE<br>Defendants, | CASE NO. CV12-2108 GHK(FFMx)<br><br>**COMPLAINT VERIFIED**<br>DAMAGES EXCESS $25,000<br><br>**DEMAND JURY TRIAL**<br><br>1. LACK OF STANDING<br>2. DECEIT INTENTIONAL MISREPRESENTATION<br>3. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>4. SLANDER OF TITLE<br>5. QUIET TITLE<br>6. DECLARATORY RELIEF<br>7. VIOLATIONS OF CALIFORNIA CIVIL CODE SECTION 2932.5<br>8. VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ<br>9. **VIOLATION OF SECTION §726 CA. CODE OF CIV PROCEDURE**<br>10. CIVIL RICO 18 U.S.C. §§ 1961(5), 1962(b) |

COMES NOW the Plaintiffs, MARLENE BALA ("Plaintiffs'), complaining of the Defendants, and each of them, as follows:

PAID

MAR 13 2012

Clerk, US District Court
COURT 4612

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over the claims in this action based on 28 U.S.C. §§ 1331, 1332, 1343, and 42 U.S.C. §1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law and matters between diverse citizens that involve an amount in controversy in excess of $75,000.00. This Court also has supplemental jurisdiction over the pendant state law claims because they form a part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. §1367.

2.      The unlawful conduct, illegal practices, and acts complained of and - alleged in this Complaint were all committed in the Federal District of California and the involved real property located in the Federal District of California. Therefore, venue properly lies in this District, pursuant to 12 U.S.C. §2614 and 28 U.S.C. §1391(b).

3.      Plaintiffs are ignorant of the true identity and capacity of defendants designated as Does 1-100, but will amend the Complaint when their identities have been ascertained according to proof at the time of trial. Plaintiffs allege on information and belief, however, that each and every Doe Defendant is in some manner responsible for the acts, and conduct of the other defendants, and were, and are responsible for the injuries, damages, and harm, incurred by Plaintiffs. Plaintiffs further allege on information and belief that each such designated defendant acted, and acts, as the authorized agent, representative, and associate of the other defendants in doing the things alleged herein. >

4.      Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendants.

5.      Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

6.      At all relevant times, each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint. Additionally, some or all of the defendants acted as the agent of the other defendants, and all of the defendants acted within the scope of their agency if acting as an agent of the other.

7.      At all relevant times, each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other defendants in the unlawful conduct.

## INTRODUCTION

1.      This is an action brought by Plaintiffs for declaratory judgment, injunctive and equitable relief, and for compensatory, special, general and punitive damages.

2.      Plaintiffs, homeowners, dispute the title and ownership of the real property in question (the "Home"), which is the subject of this action, in that the originating mortgage lender, and others alleged to have ownership, have unlawfully sold, assigned and/or transferred their ownership and security interest in a Promissory Note and Deed of trust related to the Property, and thus, do not have lawful ownership or a security interest in Plaintiffs' Home which is described in detail herein.

3.      Plaintiffs allege that Defendants, and each of them, cannot show proper receipt, possession, transfer, negotiations, assignment and ownership of the borrower's original Promissory Note and Deed of Trust, resulting in imperfect security interests and claims.

4.      Plaintiffs further alleges that Defendants, and each of them, cannot establish possession and proper transfer and/or endorsement of the Promissory Note and proper assignment of the Deed

of Trust herein; therefore, none of the Defendants have perfected my claim of title or security interest in the Property. Defendants have perfected any claim of title or security interest in the Property. Defendants, and each of them, do not have the ability to establish that the mortgages that secure the indebtedness, or Note, were legally or properly acquired.

5. Plaintiffs allege that an actual controversy has arisen and now exists between the Plaintiffs and Defendants, and each of them. Plaintiffs desire a judicial determination and declaration of its rights with regard to the Property and the corresponding Promissory Note and Deed of Trust.

6. Plaintiffs also seek redress from Defendants identified herein below for damages, for other injunctive relief, and for cancellation of written instruments based upon:

    a. An invalid and unperfected security interest in Plaintiffs' Home hereinafter described;

    b. Void "True Sale(s)" violating express terms of the **FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I** ("PSA") governing the securitization of Plaintiffs; mortgage, which is a Trust Agreement not required to be filed under with the United States Securities and Exchange Commission ("SEC") and along with another document, the Mortgage Loan Purchase Agreement ("MLPA"), is the operative securitization document created by the finance and securitization industry to memorialize securitization transaction (see further discussion of the PSA herein);

    c. An incomplete and ineffectual perfection of a security interest in Plaintiffs' Home;

    d. Violations of California Business and professions Code §17200 (Unfair Business Practices) and

    e. A void or voidable Deed of Trust due to improper securitization, for which there is a

reasonable apprehension that, if left outstanding, may cause a serious injury.

## **THE PARTIES**

7.   Plaintiffs are now, and at all times relevant to this action, residents of the County of San Joaquin, State of California.

8.   The Plaintiffs may bring in or consolidate with this case other persons who are similarly situated to Plaintiffs identified above.  Further, at all times material hereto, any of the Defendants have acted in the same or in another capacity with respect to loan processing.  All of the foregoing secured real estate loans made to Plaintiffs were wrongfully and handled and processed by Defendants, resulting in damages.  From time-to-time, upon conducting the due diligence and learning the information sufficient to add remaining Plaintiffs to this action, Plaintiffs shall seek leave of Court to amend this Complaint to name these additional Plaintiffs, or will follow such other process as is prescribed by the Court. In the event Plaintiffs believe it is in furtherance of judicial economy and justice to add all or any of these additional persons to this Complaint, Plaintiffs shall bring a noticed motion and to add such parties to this action or follow such procedure as the Court in this case may specify.  In the event Plaintiffs file a separate lawsuit appertaining to all or any of these persons, or such further number as may exist in view of future developments, Plaintiffs shall file all appropriate Notices of Related Cases in accordance with California law, or as otherwise directed by the Court.

9.   Defendant COUNTRYWIDE BANK, FS, ("ORIGINAL LENDER") is doing business in the County of Los Angeles, State of California.  Plaintiffs are further informed and believe, and thereon allege, that "ORIGINAL LENDER", is the Originator of the loan and/or purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint. Plaintiffs are further informed and believe that the "ORIGINAL LENDER" is a participant in fraud

on the Plaintiff in the origination of the note.

10. Defendant, LANDSAFE TITLE, as the "TITLE COMPANY" who oversee the recording and processing of both Deed of Trust and Promissory Note is doing business in Los Angeles, State of California. Plaintiffs are further informed and believe, thereon allege, that the Original Trustee and Title Company of the loan and/or purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint. Plaintiffs are further informed and believe that the "TITLE COMPANY" is a participant in fraud on the Plaintiff in the origination of the note.

11. Defendant, RECONTRUST COMPANY N.A., as the "ORIGINAL TRUSTEE" who oversee the recording and processing of both Deed of Trust and Promissory Note is doing business in Los Angeles, State of California. Plaintiffs are further informed and believe, thereon allege, that the Original Trustee and Title Company of the loan and/or purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint. Plaintiffs are further informed and believe that the "ORIGINAL TRUSTEE" is a participant in fraud on the Plaintiff in the origination of the note.

12. Defendant, BEAR STEARNS & CO., INC., FTN FINANCIAL CAPITAL, BLAYLOCK & PARTNERS, LP, DEUTSCHE BANK SECURITIES, and VINING-SPARKS IBG, LP ("JOINT BOOK RUNNING MANAGERS" or the PSA Sponsor and Depositor), is doing business in the County of Los Angeles, State of California. Plaintiffs are further informed and believe, and thereon allege, that PSA Sponsor and Depositor" is the present purported Securitization Seller of a portion of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositors by one or more special purpose entities that were established by

"DEPOSITOR" which, in turn, acquired those mortgage loans directly from "ORIGINAL LENDER" herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

13. Defendant, CAPITAL RESEARCH AND MANAGEMENT COMPANY, and THE GROWTH FUND OF AMERICA, INC, ("PSA Filers"), is doing business in the County of Los Angeles, State of California. Plaintiffs are further informed and believe, and thereon allege, that PSA Filers" is the present purported Securitization of a portion or as a whole of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositors by one or more special purpose entities that were established by "DEPOSITOR" which, in turn, acquired those mortgage loans directly from "ORIGINAL LENDER" herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

14. Defendant, BANK OF AMERICA, N.A. ("PSA SERVICER"), is a National Banking Association, doing business in the County of Los Angeles, State of California. Plaintiffs are further informed and believe, and thereon allege, that "PSA SERVICER", is the present purported Master Servicer of the mortgage herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

15. Defendant, FEDERAL NATIONAL MORTGAGE ASSOCIATION ("PSA Administrator"), is doing business in the County of Los Angeles, State of California. Plaintiffs are further informed and believe, and thereon allege, that "PSA Administrator", is the present purported PSA Issuer of the mortgage herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference

herein), as more particularly described in this Complaint.

16. Defendant, RECONTRUST COMPANY, N.A. ("FORECLOSING TRUSTEE"), Plaintiffs are informed and believe, and thereon allege, is a national financial services association and doing business in the County of Los Angeles, State of California and is the purported "FORECLOSING TRUSTEE" of the mortgage herein and/or a purported participant in the imperfect securitization of the Note and/or the Deed of Trust as more particularly described in this Complaint.

17. Defendant, T SEVILLANO, as Executor of the recorded Assignment of Deed of Trust as Assistant Secretary of MERS, INC., suspected as Robo-Signor as per attached for herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

18. Defendant, NINOUSH SAMIMI as Notary of the recorded Assignment of Deed of Trust., suspected as the accomplish of the Robo-Signor as per attached for herein and/or is a purported participant in the imperfect securitization of the Note (incorporated by reference herein) and/or the Deed of Trust, (incorporated by reference herein), as more particularly described in this Complaint.

19. At all times relevant to this action, Plaintiffs have owned the Property located at 4308 TOLAND WAY, LOS ANGELES, CA 90041 (the "Property").

20. Plaintiffs do not know the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 10, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiffs, or claims some right, title, or interest in the Property. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and therefore allege, that all relevant times mentioned in this Complaint, each

of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiffs so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

21. Plaintiffs are informed and believe, and thereon allege, that's at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## FACTUAL ALLEGATIONS

22. Plaintiffs executed a series of documents, including but not limited to a Note and Deed of Trust, securing the Property in the amount of note. The original beneficiary and nominee under the Deed of Trust was "ORIGINAL LENDER".

23. Plaintiffs are informed and believe, and thereon allege, that this loan was securitized, with the Note not being properly transferred to Defendant, "PSA SERVICER", acting as the Servicer for the Securitized Trust. As set forth herein above, the Securitized Trust was formed by execution of the PSA.

24. Plaintiffs are informed and believe, and thereon allege, that the purchase mortgage on the Property, the debt or obligation evidenced by the Note and the Deed of Trust executed by Plaintiffs in favor of the original lender and other Defendants, regarding the Property, was not properly assigned and transferred to Defendants operating the pooled mortgage funds or trusts in accordance with the PSA of the entities making and receiving the purported assignments to this trust.

34. "ORIGINAL LENDER" was a "correspondent lender" that originated mortgage loans which in turn, was sold and transferred into a "federally-approved securitization" named **FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I.**

35. The Note and Deed have taken two distinctly different paths. The Note was securitized into FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I.

36. The written agreement that created the FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I is a matter of public record described in an "Offering Circular," available on the Fannie Mae website.   The promissory note in this case became Fannie Mae property in compliance with the requirement set forth in the Offering Circular.   The acquisition of the assets of the subject Fannie Mae Fixed to Floating Rate Non-Cumulative Preferred Stock Series I and the Offering Circular are governed under the law.

37. Moreover, Fannie Mae is not required to register the Preferred Stock with the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended. The shares of Preferred Stock are "exempted securities" within the meaning of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

38. The loan was originally made to FIRST MAGNUS FINANCIAL CORPORATION and was sold and transferred to FANNIE MAE FIXED TO FLOATING RATE NON-CUMULATIVE PREFERRED STOCK SERIES I.  There is no record of Assignments from the original lender First Magnus Financial Corporation Loan to Fannie Mae.

39. In *Carpenter v. Longan* 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), *the U.S. Supreme Court stated "The note and mortgage are inseparable; the former as essential, the latter as an incident.  An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."*

An obligation can exist with or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. If the creditor transfers the note but not the deed of trust, the transferee receives a secured note; the security follows the note, legally if not physically. If the transferee is given the deed of trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement. (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685)

"Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000)

49.    By statute, assignment of the mortgage carries with it the assignment of the debt. . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose*, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. *The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.*"

50.    ANY ATTEMPT TO TRANSFER THE BENEFICIAL INTEREST OF A TRUST DEED WITHOUT OWNERSHIP OF THE UNDERLYING NOTE IS VOID UNDER CALIFORNIA LAW.

51. Plaintiffs, therefore, allege, upon information and belief, that none of the parties to neither the securitization transaction, nor any of the Defendants in this case, hold a perfected and secured claim in the Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

## FIRST CAUSE OF ACTION
### LACK OF STANDING
### (AGAINST ALL DEFENDANTS)

52. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

53. An actual controversy has arisen and now exists between Plaintiffs and Defendants specified hereinabove, regarding their respective rights and duties, in that Plaintiffs contend that Defendants, and each of them, do not have the right to foreclose on the Property because Defendants, and each of them, have failed to perfect any security interest in the Property. Thus, the purported power of sale by the above specified Defendants, and each of them, no longer applies. Plaintiffs further contend that the above specified Defendants, and each of them, do not have the right to foreclose on the Property because said Defendants, and each of them, did not properly comply with the terms of Defendants' own securitization requirements and falsely or fraudulently prepared documents required for Defendants, and each of them, to foreclose as a calculated and fraudulent business practice.

54. Plaintiffs are informed and believe and there upon allege that the only individual who has standing to foreclose is the holder of the note because they have a beneficial interest. The only individuals who are the holder of the note are the certificate holders of the securitized trust because they are the end users and pay taxes on their interest gains; furthermore, all of the banks in the middle were paid in full.

55. Plaintiffs request that this Court find that the purported power of sale contained in the Note and Deed of Trust has no force and effect at this time, because Defendants' actions in the processing, handling and attempted foreclosure of this loan involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of State laws designed to protect borrowers, which has directly caused Plaintiffs to be at an equitable disadvantage to

Defendants, and each of them. Plaintiffs further request that title to the Property remain in its name, with said Deed of Trust remaining in beneficiaries' name, during the pendency of this litigation, and deem that any attempted sale of the Property is "unlawful and void".

56. Defendants, and each of them, through the actions alleged above, have illegally commenced foreclosure under the Note on the Property via a foreclosure action supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiffs great and irreparable injury in that real property is unique.

57. The wrongful conduct of the above specified Defendants, and each of them, unless restrained and enjoined by an Order of the Court, will continue to cause great and irreparable harm to Plaintiffs. Plaintiffs will not have the beneficial use and enjoyment of its Home and will lose the Property.

58. Plaintiffs has not other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiffs. Plaintiffs have suffered and will continue to suffer in the future unless Defendants' wrongful conduct is restrained and enjoined because real property is inherently unique and it will be impossible for Plaintiffs to determine the precise amount of damage it will suffer.

## SECOND CAUSE OF ACTION

### DECEIT INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

59. Plaintiffs re-allege and incorporate by reference all preceding paragraph as though fully set forth herein.

60. The State of California has statutorily prescribed non-judicial foreclosure procedures, in Sections §2924 et. seq. In the Cal. Civil. Code. Homes are normally foreclosed pursuant to the statutory power of sale, without a pre-foreclosure court hearing.

61. Pursuant to Statutory requirements, entities seeking to exercise a right of foreclosure pursuant to a Deed of Trust, [foreclosing on mortgages] must strictly comply with the State's Statutory Prerequisites to foreclosure.

62. The foreclosing entity must have actual assigned legal authority to file the Notice of Default ..the power of sale, Cal. Civil Code §725 a. §726.  The statutory power of sale, …in virtually all California residential mortgages provides for foreclosure sales approve by the "beneficiary" and **by the trustee** named in a deed.. or if there be a successor trustee duly recorded, as in Section "§725 Cal. Civil Code.

63. Deed of Trusts, rights to exercise a power of sale by the Trustee and dictated by the owner of the note under the contract may be assigned, but a valid written assignment, consistent with the statute of frauds, is a prerequisite to effectuate an assignment Section §2932.5 of the California Code.

64. With the absence, defective or unperfected assignment or substitution, an entity attempting to avail of any rights of a Trustee, has no rights as a "trustee", and there is only one Trustee to act at a time.  The trustee …or to send notices required by the statute of fraud, governing the Deed of Trust Contract acknowledged and signed by Plaintiff.

65. A foreclosing trustee and beneficial owner owe the mortgagor a duty of good faith and reasonable diligence in the foreclosure process.  Failure to send a legally correct statutorily required notice is inconsistent with the duty of good faith and reasonable diligence.

66. Statute of frauds, Section §2932.5 Cal. Civil Code, dictates how an assignee, is required to possess such assignment in writing and record such.

67. The Defendants owed a duty of good faith and reasonable prudence while doing the diligence in the commencement and conduct of foreclosing proceedings.

68. The complexities of MERS, Securitization, Credit Default Swaps, Insurance Reimbursements, HAMP Monies, FDIC, and the AIG bailout make the tradition lending practices incongruent.

69. This is not the traditional model most everyone older than 40 grew up understanding.  It is complex and has many side agreements.

70. The assignment of a mortgage without a transfer of the indebtedness confers no right, since debt and security are inseparable and the mortgage alone is not a subject of transfer. "A trust deed has no assignable quality independent of the debt; it may not be assigned or transferred apart

from the debt; and an attempt to assign the trust deed without a transfer of the debt is without effect."

71. The Promissory Note is a negotiable instrument.  Transferring a Deed of Trust by itself does not allow enforcement of the instrument unless the Promissory Note is properly negotiated. Where an instrument has been transferred, enforcement abilities based upon possession, Section §3301 (Cal. Com. Code) negotiable instrument. "Exhibit A-1" copy of the recorded Deed of Trust, Paragraph 20, mentions that "*"The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower."*

72. None of the Defendants are present holder of the instrument or are non holders in possession with rights of the holder.  None of the Defendants are entitled to enforce the instrument Sections 3309 & 3418 sub. (d) of the California Com. Code.

73. On March 25, 2010 "Foreclosing Trustee" stated in the Notice of Default that: The present beneficiary under such deed of trust, has executed and delivered to said agent, ..Declaration of Default and Demand .. and has **deposited with said agent such deed of trust and all documents evidencing obligations secured** thereby, … trust property to be sold to satisfy the obligations secured thereby.

74. Defendants have no enforceable rights under Cal. Com. Code 3301(a) and it is unknown where Plaintiff security interest is located.  "Foreclosing Trustee" states they have the note and the Deed of Trust in a publically recorded document.

75. NY Trust Laws and IRS Tax Statutes suggest, as a matter of law, that this feat would cause a large tax burden by such acceptance into a tax exempt trust.

76. Defendants knew these actions were a false representation, done with the intent to deceive and induce reliance by Plaintiff, and others whereby the fruits of these inducements would inure to the enrichment and benefits to the defendants herein.

77. The Securities and Exchange filings for the NY Trust outlines proper legal procedure. Sections of the Pooling and Servicing Agreement as per "Exhibit A" presented in the Securitization Analysis Report, outline in detail procedures for proper processing of both the Deed of Trust and Notes, and placing them in trust in a recordable form. This specific step is necessary for the underwriting and insurance guarantees.  This enforceable agreement demonstrates the deceit placed on this Court. This is an SEC regulated offering not a simple loan.

78. This Pooling and Servicing agreement further demonstrates deceit on this court. The assignment presented in the recording is untrue by operation of law. This Trust was closed to any substitutions after PSA Cut-off Date.

79. Assigning a defaulted loan into a tax sheltered fund would cause a major tax implication, tax impact to the shareholder into the millions of dollars, and in violation of the Securities Laws for which they used to register such an offering.

80. The deed of trust substitution is absolute trickery and a means to mislead the court and others into the devious and dishonest business practices these entity continue to propagate on innocent people such as Plaintiff.

81. Plaintiff has a document that states the "Original Lender". It came from "Original Servicer". It states that "Original Lender" was the warehouse lender and that the money was funded from them.

82. The Securities and Exchange Commission filings publically submitted by "SPONSOR/SELLER", did not reveal a warehouse line from "ORIGINAL LENDER". "ORIGINAL LENDER since has been closed and is now formally being investigated by the Department of Justice.

83. Plaintiff's copy of this note after it was endorsed in blank without recourse. It would appear to be a nullity and separates the note from any recordable interest. (ex-4)

84. The deceit above may be summarized for easy access of each of the parties:

a) "ORIGINAL LENDER" information including deceit outlined in Cause of Action #1. "ORIGINAL LENDER" apparently failed to lend any of their own money for Plaintiff's loan despite indicating it had done so both contractually and verbally. Plaintiff relied on this information, acted on this information, "ORIGINAL LENDER" intended Plaintiff to act on such information while knowing this information was not true, and Plaintiff so acted to his detriment. "ORIGINAL LENDER" was fully aware of such self dealings and deceptions. This may have may issues with excessive and undisclosed "Yield Spread Premiums"

b) "ORIGINAL TRUSTEE" as Trustee with such duties was patently false on its surface as it was the lender and has responded to suit as such. This Trustee has a contractual conflict of interest because the "ORIGINAL LENDER" was put forth to mislead and allow the events to take place in a closed closely controlled transaction without representation of Plaintiff's interests, while knowing that the information was

not true and that Plaintiff relied on such honesty and presentation to act, and was induced with "ORIGINAL SERVICER" to act and that Plaintiff did to his detriments. This duel action of lender and trustee is a conflict unroofed due to the extra ordinary efforts to detail the mortgage proffering business. This "Special Relationship" goes from Insurance, Escrow, and Mortgage Broker (friends), and is incestuous, omnipresent, and indistinct able.

c) "FORECLOSING   TRUSTEE",   acting   through   instructions   from   "PSA SERVICER", and not a signed agent of the beneficiary and not with an agency agreement to perform for that Beneficiary. "FORECLOSING TRUSTEE' acted without regards to the truth, and not in compliance with requests. Distortion of truths done knowing the actual truth, with the intent for others to act including Plaintiff, Courts and other consumers, to the detriment of the same. They are involved in thousands of foreclosures the full extent is just now starting to surface. "FORECLOSING TRUSTEE" did not have an agency agreement with "PSA TRUSTEE" the alleged Beneficiary. "PSA SERVICER" has the agreement with "SERVICER", the Master Servicer. Filing documents known to be false as "PSA TRUSTEE" agent of the beneficiary is incorrect and further misleading. Plaintiff has sworn testimony in court depositions which allows further light to shine on these activities.

d) "SERVICER" as outlined above has acted without regards to the statutory FDCPA duties of the newly acquired Master Servicer, including notifying Plaintiff of any change in ownership or what amount was due on his account. "SERVICER" had the duty to respond to the Beneficiary Statement request governed by Section §2943 of the California Code. It did not. All done while knowing the truth. All done contrary to the statutory requirements set forth, with the intent for Plaintiff and others to act, and while knowing what they were doing was not truthful. The Plaintiff relied on this to his detriments, and has been damaged. Plaintiff diligence and documents will support these claims, and that of expert witnesses.

e) "PSA TRUSTEE" has a duty as Trustee of an SEC filed Securitization Trust to follow the Pooling and Servicing Agreements and also to follow NY Trusts, SEC Security Laws and IRS tax laws. "PSA TRUSTEE" as alleged assigned Beneficiary took in assignment of this defaulted loan had a direct assigned contractual duty to Plaintiff. A loan in default is not allowed to be added to a tax free trust by the NY Trust

Laws. "PSA TRUSTEE" knew this was the fact. "PSA TRUSTEE" did these acts knowing that they were not allowed. "PSA TRUSTEE" did this while creating a paper trail that Plaintiff and others would rely on to their detriments. "PSA TRUSTEE" knew the damages that this would cause. "PSA TRUSTEE" further knew that Plaintiff's loan was paid by either cross collateralization, insurance, swaps, or other mechanisms. PSA TRUSTEE is trying to collect on the same loan multiple times."

85. Plaintiff had no indication that he should not rely on the fraudulent and deceitful misrepresentation and for that he has suffered the resulting damages of loss of personal savings, costs of the representation, credit damages, and opportunity costs resulting in the full time focus of his representation, and other damages determined at trial. This maybe subject to punitive, consequential, emotional distress, and recession.

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

86. Plaintiffs re-allege and incorporated by reference all preceding paragraphs as though fully set forth herein.

87. The actions of Defendants, as set forth herein, have resulted in the Plaintiffs being threatened with the loss of the Property.

88. This outcome has been created without any right or privilege on the part of the Defendants, and, as such, their actions constitute outrageous or reckless conduct on the part of Defendants.

89. Defendants intentionally, knowingly and recklessly misrepresented to the Plaintiffs those Defendants were entitled to exercise the power of sale provision contained in the Deed of Trust. In fact, Defendants were not entitled to do so and have no legal, equitable, or actual beneficial interest whatsoever in the Property.

90. Defendants' conduct – fraudulently attempting to foreclose on a property in which they have no right, title, or interest – is so outrageous and extreme that it exceeds all bounds which is usually tolerated in a civilized community.

91. Such conduct was undertaken with the specific intent of inflicting emotional distress on the Plaintiffs, such that Plaintiffs would be so emotionally distressed and debilitated that he/she would be unable to exercise legal rights in the Property; the right to title of the Property, the right to cure the alleged default, right to verify the alleged debt that Defendants are attempting to collect, and right to clear title to the Property such that said title will regain its marketability and value.

92. At the time Defendants began their fraudulent foreclosure proceedings, Defendants were not acting in good faith while attempting to collect on the subject debt. Defendants, and each of them, committed the acts set forth above with complete; utter and reckless disregard of the probability of causing Homeowners to suffer severe emotional distress.

93. As an actual and proximate cause of Defendants attempt to fraudulently foreclose on Plaintiff's home, the Plaintiffs have suffered severe emotional distress, including but not limited to lack of sleep, anxiety, and depression.

94. Plaintiffs did not default in the manner state in the Notice of Default, yet because Defendants' outrageous conduct, Plaintiffs have been living under the constant emotional nightmare of losing the Property.

95. As a proximate cause of Defendant's conduct, Plaintiffs have experienced many sleepless nights, severe depression, lack of appetite, and loss of productivity at its place of employment.

96. The conduct of Defendants, and each of them, as herein described, was so vile, base, contemptible, miserable, wretched, and loathsome that it would be looked down upon and despise by ordinary people. Plaintiffs are therefore entitled to punitive damages in an amount appropriate

to punish Defendants and to deter other from engaging in similar conduct

## FIFTH CAUSE OF ACTION

### SLANDER OF TITLE

### (Against All Defendants and Does 45-60)

97. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

98. Plaintiffs incorporate here each and every allegation set forth above. Defendants, and each of them, disparaged Plaintiffs' exclusive valid title by and through the preparing, posting, publishing, and recording of the documents previously described herein, including, but not limited to, the RECORDED DOCUMENTS.

99. Said Defendants knew or should have known that such documents were improper in that at the time of the execution and delivery of said documents, Defendants had no right, title, or interest in the Property.  These documents were naturally and commonly to be interpreted as denying, disparaging, and casting doubt upon Plaintiffs' legal title to the Property.  By posting, publishing, and recording said documents, Defendants' disparagement of Plaintiffs' legal title was made to the world at large.

100.   As a direct and proximate result of Defendants' conduct in publishing these documents, Plaintiffs' title to the Property ahs been disparaged and slandered, and there is a cloud on Plaintiffs' title, and Plaintiff has suffered, and continues to suffer, damages in an amount to be proved at trial.

101.   As a further proximate result of Defendant's conduct, Plaintiffs have incurred expenses in order to clear title to the Property.  Moreover, these expenses are continuing, and Plaintiffs will incur additional charges for such purpose until the cloud on Plaintiffs' title to the

property has been removed.  The amounts of future expenses and damages are not ascertainable at this time.

102.    As a further direct and proximate result of Defendants' conduct, Plaintiffs have suffered humiliation, mental anguish, anxiety, depression and emotional and physical distress, resulting in the loss of sleep and other injuries to his and her health and well-being, and continue to suffer such injuries on an ongoing basis.  The amount of such damages shall be prove at trial.

103.    At the time that the false and disparaging documents were created and published by the Defendants, Defendants knew the documents were false and created and published them with the malicious intent to injure Plaintiffs and deprive them of their exclusive right, title and interest in the Property, and to obtain the Property for their own use by unlawful means.

104.    The conduct of the Defendants in publishing the documents described above was fraudulent, oppressive, and malicious.  Therefore, Plaintiffs are entitle to an award of punitive damages in an amount sufficient to punish Defendants for their malicious conduct and deter such misconduct in the future.

## FIFTH CAUSE OF ACTION

### QUIET TITLE

### (Against All Defendants)

105.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

106.    Plaintiffs are entitle to equitable relief by a judicial decree and order declaring Plaintiffs to be the title owner of record of the Property as to the effective date of said cancellation, and quieting Plaintiffs' title therein and thereto subject only to such legitimate liens and encumbrances as the Court may deem void, and avoiding any liens or encumbrances upon the

Property created by Defendants or by their punitive predecessors, or by any of them.

107.    Plaintiffs desire and is entitled to a judicial declaration quieting title in Plaintiffs as of the date on which is loan transaction was consummated.

### SIXTH CAUSE OF ACTION

### DECLARATORY RELIEF

### (Against All Defendants)

108.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

109.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their rights and duties regarding the Note and Trust Deed.

110.    Plaintiffs contend that pursuant to the Loans, Defendants do not have authority to foreclose upon and sell the Property.

111.    Plaintiffs are informed and believed and upon that basis alleges that Defendants dispute Plaintiffs contention and instead contend they may properly foreclose upon the Property.

112.    Plaintiffs thereof request a judicial determination of the rights, obligations and interest of the parties with regard to the Property, and such determination is necessary and appropriate at this time under the circumstances so that all parties may ascertain and know their rights, obligations and interests with regard to the Property.

113.    Plaintiffs request a determination of the validity of the Trust Deeds as of the date the Notes were assigned without a concurrent assignation of the underlying Trust Deeds.

114.    Plaintiffs request a determination of the validity of the NOD.

115.    Plaintiffs request a determination of whether any Defendant has authority to foreclose on the Property.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CIVIL CODE SECTION 2932.5

### (Against all Defendants)

116.   Plaintiffs re-allege and incorporate by reference all preceding paragraph as though fully set forth herein.

117.   California Civil Code § 2932.5 provides.

> Where a power to sell real property is given to a mortgagee, or other encumbrances, in an instrument intended to secure the payment of money, the power is part of the Security and vests in any person who by assignment becomes entitled to payment of the money secured by the instruments. The power of sale may be exercised by the assigned if the assignment us duly acknowledged and recorded.

118.   Plaintiffs are informed and believe, and thereon allege that § 2932.5 require the recordation of an assignment of the beneficial interest in a deed of trust prior to foreclosure. Defendants, and each of them, cannot show valid and recorded assignments.

119.   As a proximate result of Defendant's action, Plaintiffs have been damaged in an amount not yet ascertained, to be proven at trial.

120.   WHEREFORE, Plaintiffs prays for relied as set forth below.

## EIGHTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ
### (Against All Defendants and Does 80-100)

121.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth therein.

## RECENT DEVELOPMENTS AND DOCUMENT FRAUD

122.   On September 24, 2010, California Attorney General, Edmund G. Brown, Jr. (aka Jerry Brown) ("AG"), directed ALLY Financial, Inc., which owns GMAC, Mortgage LLC, to stop

foreclosures in California until it proves it is complying with State law.

123.    On October 1, 2010, the AG similarly requested that a J.P. Morgan Chase stop foreclosure in California until it proves it is complying with State law.

124.    Since then, Bank of America has halted foreclosures in 23 judicial foreclosure States.

125.    On or about October 11, 2010, BAC announced that it is temporarily halting foreclosures nationwide.

126.    The impetus of these necessary but drastic measures stems from allegations of document fraud on the part of the banks and their servicers. This epidemic is not limited to the banks listed above, but is an industry wide problem.

127.    During the securitization era, Banks and the resulting trusts, in the rust to securitized mortgages and sell those to investors routinely ignored the critical step of obtaining mortgage assignments from the original lenders to the securities companies to the trusts.

128.    Now, years later, when the companies "servicing" the trusts need to foreclose, there are no documents available to documents the proper chain of title because none were originally created. As a result, banks are creating the missing documents or outsourcing the documents to companies like Lender Processing Services to produce the needed assignments. This practice was admitted by deposed bank executives such as GMAC's Jeffrey Stephen who admitted in sworn deposition testimony to signing more than 500 documents a day and up to 10, 000 documents a month related to foreclosures without reviewing them.

129.    Due to the strict timelines and guidelines to complete a foreclosure, banks are also fabricating other documents to comply with California's foreclosure guidelines.

130.    The impact of these allegations is so cogent that Old Republic National Title Company will no longer insure the title on homes foreclosed by J.P. Morgan Chase or GMAC,

Mortgage LLC.

131. As further proof of the unlawful business practices, other state legislatures have taken steps to make the process more transparent (see Arizona State Senate Bill 1259, requiring non-originating foreclosure lenders to produce full chain of title to verify ownership). http://www.azleg.gov/DocuemtnsForBill.asp? Bill_Number=SB1259&Session_ID=102

132. Other states have taken the lead to void foreclosure sales by parties who lack standing to foreclose. *See, e.g., U.S. Bank Nat. Ass'n v. Ibanez* (2011) 941 N.E.2d 40. Most recently, an Alabama Circuit recognized the legal ramifications regarding the failure of banks and their trustees to properly transfer Notes and Deeds of Trusts. In *Phyllis Horace v. La Salle Bank National Association, Et Al,* 57-cv-2008-00362.00, the Alabama Circuit Court not only sided with the homeowner on this exact issue; the court issued an order **permanently enjoining** the defendant trust, LaSalle Bank National Association, from foreclosing on the plaintiff's house because LaSalle failed under New York law and its own Pooling and Servicing Agreement to properly transfer the plaintiff's mortgage note on the plaintiff's home.

133. In permanently forestalling any foreclosure on the home by defendant, the court did not mince words: "First, the Court is surprised to the point of astonishment that the defendant (LaSalle Bank National Association) did not comply with the terms of its own Pooling and Servicing Agreement and further did not comply with New York Law in attempting to obtain assignment of Plaintiff Horace's notes and mortgage. Second, plaintiff Horace is a third party beneficiary of the Pooling and Servicing Agreement created by the defendant trust (LaSalle Bank National Association). Indeed without such Pooling and Servicing Agreements, Plaintiffs Horace and other mortgagors similarly situated would never have been able to obtain financing."

134. Plaintiffs are informed and believe, and therefore allege, that Defendants, and each of them, engaged in unlawful, unfair or fraudulent business acts or practices and unfair, deceptive,

untrue or misleading advertising in violation, rising to unfair and deceptive business practices, in violation of California Business and Professions Code § 17200 and the Unfair and Deceptive Acts and Practices statutes.

135. The above specified Defendant, and each of them, as part of their business practices, fraudulently and knowingly procured or offered false or fraudulently prepared documents to fabricate the missing gaps in the chain of title or to falsely demonstrate compliance with the PSA, state law and Regulations related to non-judicial foreclosure and allowed these documents to be filed, registered, or recorded within this jurisdiction. The members of the public are likely to be deceived by this unlawful, oppressive and fraudulent business practices.

136. Plaintiffs are informed and believe, and thereon allege that Defendant lacked authority to execute an assignment of the Deed of Trust from the original beneficiary to Defendant.

137. Plaintiffs are informed and believe, and thereon allege that Defendant at all relevant times had knowledge that no such authority was ever bestowed upon it by the original lender, yet Defendant still caused to be recorded the false documents with the county recorder. Further, the assignment recorded is signed by an individual purporting to be the "Assistant Secretary" of MERS. Plaintiffs believe and thereupon allege that this individual did not have the authority or capacity to sign on behalf on MERS to cause such substitutions or assignments. As such, Plaintiffs are informed and believe, and thereon allege that certain misrepresentations, including sworn statements. Were made to the public to cause the notary public to perform an improper notary act on a document.

138. The business practices of the above specified Defendants, and each of them, were unlawful, deceptive, misleading and fraudulent and violate California law as alleged herein above. Further, the above specified Defendants, and each of them, knew that their business practices were unlawful, deceptive, misleading and fraudulent at the time they were so engaged.

139.    Pursuant to Sections 17200 et seq. of the California *Business and Professions Code*, unfair business practices include any unlawful, unfair, misleading or fraudulent business practice. The fraudulent and unlawful conduct of the above specified Defendants, and each of them, as alleged herein, constituted unlawful, unfair and/or fraudulent business practices within the provision of §§ 17200 et seq of the California *Business and Professions Code*.

140.    As a direct and proximate result of the unfair business practices of the above specified Defendants, and each of them, as herein alleged, Plaintiffs have incurred damages in that Plaintiffs' Home is now subject to foreclosure at the hands of the above specified Defendants, and each of them, all by reason of which Plaintiffs have been damaged in at least the sum of the jurisdictional amount of this Court, plus interest, attorney's fees and costs, and additional amounts, according to proof at the time of trial.

141.    As a further direct and proximate result if the unfair business practices of the above specified Defendants, and each of them, Plaintiffs are entitle to an order or preliminary injunction prohibiting said Defendants, and each of them, from selling or attempting to sell, or causing to be sold, any interest whatsoever in the Home.

### NINTH CAUSE OF ACTION
### Violation of Section § 726 of the California Code of Civil Procedure
### "PSA TRUSTEE"

144.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth therein.

145.    These provisions are "to prevent multiplicity of actions, to compel exhaustion of all security and to require the debtor to be credited with the fair market value of the secured property. It may well be interpreted as to an entity collection twice or more for the same debt. This may cause the security interest to be cancelled.

146.    "PSA TRUSTEE" is not a registered trust in California to do business, and has received over $8.5 billion payments from AIG's **default**, HAMP program, and has been paid untold

amounts from any default that occurs, it is paid by counter parties, and mortgage insurance reimbursements of untold amounts.

147.   Plaintiff alleges that "PSA TRUSTEE" has already been paid for the value of the security interest Plaintiff's property, which furthers the need for accurate accounting including previous payoff that would have cover such debt.

148.   "PSA TRUSTEE" is requested by discovery to present an accurate detail of the accountings.  Including appropriately timed sales and assignments and payoffs, and if defendant has received such credits first, then the security interest in Plaintiff's property would be lost.  "PSA TRUSTEE" takes advantage of the insurances and credit enhancements inside of the trust (such as excess interest reserves, over collateralization reserves, NIMS or other insurance policies which were written by AIG), which cover losses on the mortgage loans.

149.   Plaintiff request that the security interest in this property be removed based on Section § 726 of California Code of Civil Procedure as this interest has been paid.

**TENTH CAUSE OF ACTION**
**CIVIL RICO**

**COUNT ONE**

Acquisition and Maintenance of an Interest in and Control of
an *Enterprise* Engaged in a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(b)

150.   Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

151.   At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

152.   During the ten (10) calendar years preceding  August 1, 2010 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

153.   Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(b) *supra*.

154.   Pursuant to the original Statutes at Large, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

155.   *Respondeat superior* (principal is liable for agents' misconduct:  knowledge of, participation in, and benefit from a RICO enterprise).

### COUNT TWO:
Conduct and Participation in a RICO *Enterprise*
through a *Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(c)

156.   Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

157.   At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

158.   Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

159.    During the ten (10) calendar years preceding July 1, 2010 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

160.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

161.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  *Respondeat superior* (as explained above).

## COUNT THREE:
Conspiracy to Engage in a
*Pattern of Racketeering Activity*:
18 U.S.C. §§ 1961(5), 1962(d)

162.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.  Substance prevails over form.

163.    At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

164.    At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d).  See also 18 U.S.C. §§ 1961(4), (5) and (9).

165.     During the ten (10) calendar years preceding July 1, 2010 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

166.     Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

167.     Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however. *Respondeat superior* (as explained above).

167. USC 891-984 Extortionate credit transactions; 1341 mail fraud, 1343 wire fraud, 1344 financial institution fraud, 1503 obstruction of justice, 1952 racketeering, 1956 laundering of monetary instruments, 1957 monetary transaction derived from specified unlawful activity, and 29 USC 186 501c – fraud connected with a case under title 11, fraud in the sale of securities.

Please take notice that Plaintiff demands trial by jury in this action

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs will ask for the following for each Cause of Action to be awarded:

## FIRST THROUGH TENTH CAUSE OF ACTION

1.  For Compensatory Damages in an amount to be determined by proof at trial;

2.  For Special Damages in an amount to be determined by proof at trial;

3.  For General Damages in an amount to be determined by proof at trial;

4.  For Punitive Damages as allowed by law;

5.  For Restitution as allowed by law;

6. For Attorney's Fees and Costs of this action;

7. For Declaratory Relief, including but not limited to the following Decrees of this Court that:

    a. Plaintiffs are the prevailing party;

    b. The Trustees of the Trusts have no enforceable secured or unsecured claim against the Property;

    c. The Sponsor has no enforceable secured or unsecured claim against the Property;

    d. The Depositor has no enforceable secured or unsecured claim against the Property;

    e. The Mortgage Originator has no enforceable secured or unsecured claim against the Property;

Dated: February 20, 2012

                          _Marlene D Bala_

                          Marlene Bala, In Pro Se
                          Attorney for Plaintiff

# "SUB-EXHIBITS TO A"

Exhibit A-1.  DEED OF TRUST
Exhibit A-2.  NOTICE OF DEFAULT
Exhibit A-3.  ASSIGNMENT OF DEED OF TRUST
Exhibit A-4.  NOTICE OF TRUSTEE'S SALE

*"LOAN-AUDITOR.ORG, SAR-NJ-ADT-ALT"*

# Exhibit A-1. DEED OF TRUST

*"LOAN-AUDITOR.ORG, SAR-NJ-ADT-ALT"*

This page is part of your document - DO NOT DISCARD





**20081770161**   Pages: 014

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

10/02/08 AT 08:00AM

Fee:  50.00
Tax:  0.00
Other: 0.00

Total: 50.00

Title Company

## TITLE(S) :



L E A D    S H E E T

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.          Number of AIN's Shown



THIS FORM IS NOT TO BE DUPLICATED

Recording Requested By·
A. PARISI



10/02/08

20081770161

After Recording Return To:
COUNTRYWIDE BANK, FSB

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By.
AMERICA PERALTA

———————————— [Space Above This Line For Recording Data] ————————————

LA950
[Escrow/Closing #]

0001944425790900B
[Doc ID #]

# DEED OF TRUST

MIN 1001337-0003320816-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated   SEPTEMBER 19, 2008   , together with all Riders to this document.
**(B)  "Borrower"** is
MARLENE DELIN BALA, AN UNMARRIED WOMAN

Borrower's address is
1136 1/2 NORTH MADISON AVENUE, LOS ANGELES, CA 90029
Borrower is the trustor under this Security Instrument

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

MERS Deed of Trust-CA
1006A-CA (02/08)(d/i)

Page 1 of 12

Form 3005 1/01



* 2 3 9 9 1 *



* 1 9 4 4 4 2 5 7 9 0 0 0 0 0 1 0 0 6 A *

$\mathcal{B}$

DOC ID #: 0001944257909008

(C)  "Lender" is
COUNTRYWIDE BANK, FSB
Lender is a FED SVGS BANK
organized and existing under the laws of THE UNITED STATES
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
(D)  "Trustee" is
RECONTRUST COMPANY, N.A
225 W HILLCREST DRIVE, MSN: TO-02, THOUSAND OAKS, CA 91360
(E)  "MERS" is Mortgage Electronic Registration Systems, Inc  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F)  "Note" means the promissory note signed by Borrower and dated   SEPTEMBER 19, 2008       The Note states that Borrower owes Lender
THREE HUNDRED SIXTY THREE THOUSAND EIGHT HUNDRED TWENTY FIVE and 00/100

Dollars (U.S. $ 363,825.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   OCTOBER 01, 2038      .
(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable].

☐ Adjustable Rate Rider      ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                   ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions
(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M)  "Escrow Items" means those items that are described in Section 3.
(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property
(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq ) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA
(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument

MERS Deed of Trust-CA
1006A-CA (02/08)                          Page 2 of 12                          Form 3005 1/01

4

DOC ID #: 0001944425790900B

**TRANSFER OF RIGHTS IN THE PROPERTY**
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  COUNTY | of |  LOS ANGELES | : |

[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

Parcel ID Number:  5474040001

4308 TOLAND WAY, LOS ANGELES

[Street/City]

California 90041-3424  ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1.     **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U S  currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim

09 1770161

MERS Deed of Trust-CA
1006A-CA (02/08)                                Page 3 of 12                                Form 3005 1/01

DOC ID #: 0001944425790908

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note;  (b) principal due under the Note, (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments

   3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

   If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

   Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

DOC ID #: 0001944425790900B

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim,

7

DOC ID #   0001944425709008

then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.    **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and

8

DOC ID #: 0001944425790908

retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value  Any balance shall be paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

MERS Deed of Trust-CA
1006A-CA (02/08)

Page 7 of 12

Form 3005 1/01

9

DOC ID #: 0001944257909008

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice

MERS Deed of Trust-CA
1006A-CA (02/08)                               Page 8 of 12                               Form 3005 1/01

10

in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.   Governing Law; Severability; Rules of Construction.**   This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.   All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.   Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.   Borrower's Copy.**   Borrower shall be given one copy of the Note and of this Security Instrument.

**18.   Transfer of the Property or a Beneficial Interest in Borrower.**   As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.   However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.   The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.   If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.   Borrower's Right to Reinstate After Acceleration.**   If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged   Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer   Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.   However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.   Sale of Note; Change of Loan Servicer; Notice of Grievance.**   The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower   A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law   There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.   If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action   If Applicable Law provides a time

DOC ID #: 0001944425790900B

period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection, (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS  Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security

12

DOC ID #: 0001944425790908

Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.**  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.  Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.**  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Marlene R Bala_ _____ (Seal)
MARLENE DELIN BALA                                                -Borrower

_____ (Seal)
                                                                          -Borrower

_____ (Seal)
                                                                          -Borrower

_____ (Seal)
                                                                          -Borrower

MERS Deed of Trust-CA
1006A-CA (02/08)                        Page 11 of 12                        Form 3005 1/01

13

DOC ID #: 0001944425790900B

State of California

County of **Los Angeles**

On **9-22-08** before me, **Gloria Montoya, Notary Public**.
personally appeared **Marlene Delin Bala**

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)



GLORIA MONTOYA
COMM #1680856
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm Exp JULY 13, 2010

14

OUR NO. 07-4-264203

EXHIBIT "A"

DESCRIPTION. THE LAND REFERRED TO HEREIN IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS.

LOT 3 OF TRACT NO. 5919, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 118, PAGES 51 TO 57 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

EXCEPT THE SOUTHEASTERLY 75 FEET THEREOF, MEASURED ALONG THE CURVE SOUTHWESTERLY LINE OF SAID LOT, THE NORTHWESTERLY LINE BEING PARALLEL WITH THE SOUTHEASTERLY LINE OF SAID LOT.

ALSO EXCEPT THE NORTHEASTERLY 60 FEET THEREOF.

PARCEL NO. 5474-040-001

08 17701619

# Exhibit A-2. NOTICE OF DEFAULT

*"LOAN-AUDITOR.ORG, SAR-NJ-ADT-ALT"*